# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **TERRANCE J. LAVIGNE** | **CIVIL ACTION** |
| **VERSUS** | |
| **CAJUN DEEP FOUNDATIONS, LLC, ET AL.** | **NO.: 12-00441-BAJ-SCR** |

## RULING AND ORDER

**I.     INTRODUCTION**

This matter involves allegations of unlawful discrimination on the basis of race by Defendant Cajun Deep Foundations, LLC ("Cajun Deep").[1] On July 14, 2014, this matter came before the Court for a non-jury trial on the merits. (Docs. 115, 120.) Having considered the parties post-trial submissions, the evidence introduced at the trial, and the arguments presented by counsel, the Court finds that Plaintiff Terrance J. Lavigne's ("Lavigne") has proven by a preponderance of the evidence that Cajun Deep paid him less than similarly situated non-African American employees for substantially the same job responsibilities, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq.* ("Title VII") and the Louisiana Employment Discrimination Law, La. R.S. § 23:301, *et seq.* As such, Lavigne is entitled to compensatory and punitive damages, including back pay. The Court further finds that

---

[1] Named Defendant Cajun Industries, LLC was dismissed by the Court on May 19, 2014, at Lavigne's request. (Doc. 87.)

Lavigne failed to prove by a preponderance of the evidence that Cajun Deep treated him worse than similarly situated non-African American employees following the February 7, 2011 excavator incident. Accordingly, Lavigne's disparate treatment claim must be dismissed. Accordingly, Lavigne's request for a judgment in his favor, injunctive relief, compensatory damages, and attorneys' fees and costs is **GRANTED IN PART** and **DENIED IN PART**. The Court's findings of fact and conclusions of law are set forth below, as required by Federal Rule of Civil Procedure ("Rule") 52(a).

## II. JURISDICTION

It is uncontested that this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## III. BACKGROUND

This is an employment discrimination action brought by Lavigne against his former employer, Cajun Deep, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq.* ("Title VII") and the Louisiana Employment Discrimination Law, La. R.S. § 23:301, *et seq.* Lavigne initially filed this lawsuit pro se.[2] Lavigne's Complaint alleges that Cajun Deep unlawfully discriminated against him on the basis of his race (African American). Specifically, Lavigne alleges that he was denied promotional opportunities, treated "less favorably than white male employees who violated the same or similar policies," and that he was wrongfully terminated for alleged violations of company policy. (Doc. 1, pp. 2-3.) Accordingly, Lavigne seeks

---

[2] Lavigne filed his Complaint on July 24, 2012. (Doc. 1.) The Court granted counsel's motion to enroll on behalf of Lavigne on February 22, 2013. (Doc. 11.)

"injunctive relief," back pay, damages, attorneys' fees, and costs. (Doc. 1, p. 3.) Cajun Deep denies all liability. (Doc. 6.)

Prior to trial, Cajun Deep filed a motion for summary judgment. (Docs. 46, 86.) Lavigne opposed the motion. (Docs. 52, 85.) After careful review of the summary judgment evidence, the Court granted in part and denied in part Cajun Deep's motion. (Doc. 102.) Specifically, the Court dismissed all but three of Lavigne's claims: (1) Lavigne's federal and state law disparate treatment claim that Cajun Deep discriminated against him when it placed him on a one-year operator's probation and suspended him for three days after he struck the girder of the southbound Interstate-310 bridge with the boom of an excavator; (2) Lavigne's federal law disparate compensation claim that Cajun Deep discriminated against him when it failed to compensate him at the rate of a supervisor for job number 11-500 in October and November 2010, and job number 11-527 in January 2011; (3) Lavigne's federal law disparate compensation claim that Cajun Deep discriminated against him when it failed to compensate him at the rate of a supervisor for job number 1-527 in January 2011.

## IV. FINDINGS OF FACT

The following findings of fact are uncontroverted or supported by the evidence in the record. Where a particular fact was controverted, the Court weighed the evidence and determined that the evidence presented by the party supporting that fact was more persuasive.

1. Lavigne is an African American male.

2. On August 18, 2005, non-party Cajun Constructors, Inc. hired Lavigne as a Laborer.

3. In October 2005, Lavigne was promoted to Driller Helper and received a pay increase to $12.00 per hour.

4. On October 26, 2006, Lavigne received a promotion to Leadman and received a pay increase to $16.00 per hour.

5. In 2007, Lavigne began working for Cajun Deep, was promoted to Drill Shaft Operator, and received a pay increase to $19.00 per hour.

6. On June 7, 2009, Lavigne was promoted to Drill Shaft Foreman and received a pay increase to $20.00 per hour.

7. Lavigne was promoted four times and received six pay raises in less than four years of employment with Cajun Deep, and went from working on crews to supervising employees and drill-only jobs as a Drill Shaft Foreman.

8. Lavigne was qualified for the position of Drill Shaft Foreman.

9. Lavigne performed duties above and beyond the position of Drill Shaft Foreman, including duties assigned to Superintendents.

10. Shortly after his promotion to Drill Shaft Foreman, Lavigne was given a company cell phone, an item reserved for Superintendents.

11. Lavigne used the company cell phone numerous times while performing the duties of a Job Site or Project Superintendent, including during job numbers 11-500 and 11-527.

12. Lavigne was also given a Superintendent's manual, which contained all of the duties of a Superintendent.

13. Lavigne referred to the Superintendent's manual several times while performing the duties of a Superintendent, including during job numbers 11-500 and 11-527.

14. On October 11, 2010, Cajun Deep designated Lavigne as the Project Superintendent for job number 11-500 in Austin, Texas.

15. Lavigne was notified at the pre-construction meeting with Chris Jacob ("Jacob"), Drill Shaft Manager, and Gene Landry ("Landry"), General Superintendent, that he would be the Project Superintendent for job number 11-500.

16. Job number 11-500 was a large job that lasted approximately thirty days and involved numerous drill shafts, two work sites, two drilling rigs, and four crew members.

17. In addition, Lavigne and his crew were sub-contracted to James Construction, a Cajun Deep client.

18. The Pre-Task Forms for job number 11-500 identify Lavigne as Project Superintendent.

19. The Work Tickets for job number 11-500 identify Lavigne as Project Superintendent.

20. The Final Completion Acceptance form for job number 11-500 identifies Lavigne as the Project Superintendent.

21. Lavigne performed the duties of a Project Superintendent while working job number 11-500.

22. Lavigne's Project Superintendent duties on job number 11-500 included: coordinating work tasks and employees; coordinating vendors; maintaining relationships with contractors; keeping track of employee time and completing payroll forms; completing expense reports; completing work tickets; completing and/or reviewing pre-task forms; ensuring employee safety; completing supervisor investigation reports; operating equipment; maintaining quality-control; and ensuring the job was completed.

23. The duties that Lavigne performed while working job number 11-500 were the same or similar to the duties performed by Project Superintendents Seth Gillen ("Gillen"), Will Rome ("Rome"), Paul Ladner ("Ladner"), Jimmy Boland ("Boland"), Sharp, and Landry.

24. Lavigne worked approximately fifty to sixty hours per week on job number 11-500.

25. Despite his designation as the Project Superintendent, and the fact that he performed duties of a Project Superintendent, Lavigne was paid at the rate of a Drill-Shaft Foreman ($20.00) for his work on job number 11-500.

26. Lavigne also worked in the capacity of Project Superintendent on job number 11-527 in Baton Rouge, Louisiana.

27. Lavigne was notified at the pre-construction meeting with Jacob and Landry that he would be the Project Superintendent for job number 11-527.

28. Job number 11-527 was a drill-and-pour job in which Lavigne was required to coordinate with concrete vendors.

29. Job number 11-527 lasted approximately two to three days.

30. Lavigne performed the duties of a Project Superintendent while working job number 11-527.

31. Lavigne's Project Superintendent duties on job number 11-527 included: coordinating work tasks and employees; coordinating vendors; maintaining relationships with contractors; keeping track of employee time and completing payroll forms; completing expense reports; completing work tickets; completing and/or reviewing pre-task forms; ensuring employee safety; completing supervisor investigation reports; operating equipment; maintaining quality-control; and ensuring the job was completed.

32. The duties that Lavigne performed on job number 11-527 were the same or similar to those of Gillen, Rome, Ladner, Boland, Sharp, and Landry.

33. Despite his designation as Project Superintendent, and the fact that he performed the duties of a Project Superintendent, Lavigne was paid at the rate of a Drill-Shaft Foreman ($20.00) for his work on job number 11-527.

34. Lavigne trained Gillen on Cajun Deep's practices and procedures for Project Superintendents.

35. Gillen was paid $1,350.00 per week, or $33.75 per hour, for his work as a Project Superintendent.

36. Lavigne performed the same or similar duties as Rome.

37. Rome did not operate equipment or have experience in the field of construction. Thus, Lavigne supervised the work of Rome during projects to which they were both assigned.

38. Lavigne performed the same or similar duties as Ladner.

39. Lavigne trained Ladner on Cajun Deep's practices and procedures for Project Superintendents.

40. Ladner was paid $1,200.00 per week, or $30 per hour, for his work as a Project Superintendent.

41. Lavigne performed the same or similar duties as Boland, who, like Lavigne, predominantly worked drill-only jobs.

42. Boland was paid $1,350.00 per week, or $33.75 per hour, for his work as a Project Superintendent on drill-only jobs.

43. Lavigne performed the same or similar duties as Sharp.

44. During the trial, Sharp testified that Lavigne had more responsibilities than him, and that Lavigne performed more Project Superintendent duties than him.

45. Sharp was paid $1,650.00 per week, or $41.25 per hour, for his work as a Project Superintendent.

46. Lavigne was never promoted to the position of Superintendent.

47. Cajun Deep benefitted financially from designating Lavigne as the Job Site or Project Superintendent and compensating him at the rate of $20.00 per hour, while it received a contract rate well above $20.00 per hour for his work.

48. On or around December 2010, Lavigne and his brother, Romell Lavigne, held a meeting with Landry to discuss the discriminatory treatment they believed they had been subjected to because of their race.

49. At the meeting, Lavigne reported that he and his brother had been subjected to discriminatory treatment by Gillen when he referred to Lavigne and his brother in a derogatory manner. Specifically, Lavigne alleged that Gillen called him and his brother "boys".

50. At the meeting, Lavigne and his brother also complained that they were not being compensated at a rate reflecting their skill and experience.

51. The December 2010 meeting with Landry occurred two months prior to Lavigne's February 2011 disciplinary action.

52. On February 7, 2011, while navigating (i.e., tracking) an excavator from the opposite side of the Interstate-310 overpass, Lavigne struck the underside of the overpass.

53. Lavigne navigated the excavator with the boom in an elevated position, and struck the underside of the overpass when he became distracted and forgot to lower the boom on the excavator..

54. Even though Lavigne was navigating the excavator at night, in limited light, with the boom extended, and in a low clearance area, he did not have a flagman assisting him.

55. Navigating an excavator without a flagman is against Cajun Deep's policies and procedures.

56. Cajun Deep's policies and procedures prohibit employees from navigating an excavator unless a flag man is present and assigned.

57. Lavigne acknowledged this fact and testified that he violated Cajun Deep's policies and procedures when he navigated the excavator without a flagman.

58. Lavigne immediately reported the February 7, 2011 incident to his immediate supervisor, Johnny White ("White").

59. Following an investigation, it was determined that the cause of this incident was operator error and violation of company policy.

60. Only minor damage to the bridge occurred as a result of the incident.

61. No damage to the excavator occurred as a result of the incident.

62. As a result of this incident, Cajun Deep issued Lavigne a written reprimand and placed him on one year's operator probation.

63. Lavigne alleges that Cajun Deep also suspended him from work for three days, and that he was not allowed to return to the Job Site during those three days.

64. However, during the trial, Lavigne testified that he was allowed on the Job Site the day after his incident.

65. It is unclear from the record evidence whether Lavigne was prohibited from working during those three days.

66. At the time of the incident, Landry was the General Superintendent for Cajun Deep's Division. Accordingly, Landry was Lavigne's General Superintendent at the time of the incident.

67. Tom Lehmann ("Lehmann") was Lavigne's Project Superintendent on job 10-

596.

68. Lavigne had been involved in two equipment incidents in the previous twenty-four months at the time of the incident.

69. On November 10, 2010, Coty Smiley (white male) struck the Interstate-310 overpass bridge with a piece of heavy-equipment while working job 10-596.

70. Smiley was not subjected to disciplinary action.

71. Lehmann was also Smiley's Project Superintendent on job 10-596.

72. Smiley had been involved in two equipment incidents in the previous twenty months at the time of the incident.

73. Smiley continued operating heavy-equipment following the November 10, 2010 incident and was not suspended.

74. On an unknown date, Lynn Ficklin ("Ficklin") (white male), scraped a column of the Interstate-310 overpass bridge with the counterweight of an excavator.

75. Ficklin was not disciplined for his actions and continued to operate machinery on job 10-596.

76. Lehmann was Ficklin's Project Superintendent on job 10-596.

77. Ficklin had been involved in one equipment incident in the previous twenty-four months at the time of the incident.

78. On January 5, 2011, John Cagle ("Cagle") (white male) caused damage to a man-lift by becoming "complacent during operation" while working job 10-600.

79. Cagle was not subjected to disciplinary action.

80. Like Lavigne, Cagle operated the equipment without a flagman.

81. Lehmann was one of Cagle's Project Superintendents within the Pile Driving Division.

82. It is unclear from the record evidence whether Lehmann was Cagle's Project Superintendent on the date of the incident despite the fact that Cajun Deep concluded that a proper pre-task plan would have prevented the incident.

83. On June 4, 2011, Ficklin struck a westbound Interstate-10 overpass with a piece of heavy-equipment.

84. Ficklin was not subjected to disciplinary action.

85. White was Ficklin's immediate supervisor at the time the incident.

86. Lehmann was Ficklin's Project Superintendent at the time the incident.

87. Ficklin had been involved in two equipment incidents in the previous twenty-four months at the time of the incident.

88. The damage caused by Ficklin's June 4, 2011 equipment incident was similar to the damage caused by Lavigne's February 7, 2011 equipment incident.

89. Ficklin continued to operate machinery following this June 4, 2011 equipment incident and was not subjected to any written discipline or a three-day suspension.

## V. CONCLUSIONS OF LAW

Title VII prohibits discrimination by employers "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Under Title VII, an employee can prove discrimination through direct or

circumstantial evidence.[3]  *Laxton v. Gap, Inc.*, 333 F. 3d 572, 578 (5th Cir. 2003), *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000).

A. **LAVIGNE'S DISPARATE COMPENSATION CLAIMS CONCERNING JOB NUMBER 11-500 IN OCTOBER AND NOVEMBER 2010, AND JOB NUMBER 11-527 IN JANUARY 2011**

To state a prima facie claim for disparate compensation, Lavigne must show that he was paid less than similarly situated non-African American employees for substantially the same job responsibilities.  *Goring v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. College*, 414 Fed. Appx. 630, 633 (5th Cir. 2011) (citing *Taylor v. United Parcel Serv., Inc.*, 554 F.3d 510, 522 (5th Cir. 2008)).  Where, as here, a case has been fully tried on the merits, the Court does not employ the *McDonell Douglas* burden shifting framework or whether the plaintiff has established a *prima facie* case.  *Smith v. Berry*, 165 F.3d 390, 394 (5th Cir. 1999); *see also Vaughn v. Sabine County*, 104 Fed. Appx. 980, 982 (5th Cir. 2004).  Rather, the Court determines whether the record as a whole contains sufficient evidence to support a finding of unlawful discrimination against the plaintiff.  *Id.*  At all times, the burden of proof rests with the plaintiff.  *See Ray v. Iuka Special Mun. Separate Sch. Dist.*, 51 F.3d 1246, 1249 (5th Cir. 1995).

Here, the Court finds that Lavigne has met his burden of proof.  The record evidence shows that, despite performing the duties of a Project Superintendent for job

---

[3] Employment discrimination claims under Title VII and the Louisiana Employment Discrimination Law are analyzed under the same standard. *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 316 (5th Cir. 2004); *Turner v. Kan. City Southern Ry. Co.*, 675 F.3d 887, 891 (5th Cir. 2012); *Knapper v. Hibernia Nat'l Bank*, 49 So. 3d 898, 902 n.11 (La. Ct. App. 2010).

13

numbers 11-500 and 11-527, Lavigne was paid at the rate of a Drill Shaft Foreman, and not at the rate of a Superintendent. Indeed, Cajun Deeps's internal documents, including Pre-Task Forms, Work Tickets, and Final Completion Acceptance Forms, all identify Lavigne as the "Project Superintendent" for job numbers 11-500 and 11-527. Yet, unlike white employees who served at the "Project Superintendent," Lavigne was paid at the rate of a Drill Shaft Foreman, and not at the rate of a Superintendent.

According to Lavigne's unrefutted testimony, Lavigne received both a Superintendent's manual and a company cell phone, equipment that was only issued to Superintendents. Lavigne also performed all of the duties of Project Superintendent while working job numbers 11-500 and 11-527, including coordinating work tasks and employees; coordinating vendors; maintaining relationships with contractors; keeping track of employee time and completing payroll forms; completing expense reports; completing work tickets; completing and/or reviewing pre-task forms; ensuring employee safety; completing supervisor investigation reports; operating equipment; maintaining quality-control; and ensuring the job was completed. Based on the evidence presented at trial, the Court concludes that Lavigne's job responsibilities during job numbers 11-500 and 11-527 were substantially the same job responsibilities as Superintendents who were compensated at a higher rate.

Further, the Court rejects Cajun Deep's contention that Lavigne is not similarly situated to non-African American Superintendents who were paid more because he worked drill-only jobs, and not drill-and-pour jobs. However, the Fifth Circuit has noted that "nearly identical" is not synonymous with "identical" because total identity

14

would be essentially insurmountable. *Lee v. Kansas City Southern Railway Co.*, 574 F.3d 253, 259-61 (5th Cir. 2009). Instead, the employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared: (1) held the same job or responsibilities; (2) shared the same supervisor or had their employment status determined by the same person; and (3) have essentially comparable violation histories. *Id.* at 260 (internal citations omitted).

Further, the Fifth Circuit has made clear that "there is no precise formula to determine whether an individual is similarly situated to comparators." *Lindquist v. City of Pasadena*, 669 F.3d 225, 233 (5th Cir. 2012). Rather, the "similarly situated" inquiry "depend[s] substantially on the facts and context of the case," "is case-specific," and "requires [the court] to consider 'the full variety of factors that an objectively reasonable . . . decisionmaker would have found relevant in making the challenged decision.'" *Id.* at 233-34 (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1203 (11th Cir. 2007)). *See also Jennings*, 383 F.3d at 1214 ("the degree to which others are viewed as similarly situated depends substantially on the facts and context of the case.").

Given the facts and context of this case, including the job responsibilities of Superintendents on drill-only versus drill-and-pour jobs, the Court finds that Lavigne is similarly situated to non-African American Superintendents who were paid more for their work on drill-only and drill-and-pour jobs. Indeed, the evidence shows that Lavigne held the same job or responsibilities as his comparators, shared the same

15

immediate supervisor or General Superintendent with many, if not all, of his comparators, and had demonstrated the same if not additional skills and experience as his comparators, as demonstrated by the unrefutted fact that he trained at least two of them.

In sum, the Court concludes that Lavigne has proven by a preponderance of the evidence that he was paid less than similarly situated non-African American employees for substantially the same job responsibilities. Accordingly, judgment in his favor as to this claim is warranted.

**B.     LAVIGNE'S DISPARATE TREATMENT CLAIM BASED ON EMPLOYMENT ACTIONS TAKEN AFTER HE STRUCK THE GIRDER OF THE SOUTHBOUND INTERSTATE-310 BRIDGE WITH THE BOOM OF AN EXCAVATOR**

Disparate treatment discrimination addresses employment actions that treat an employee worse than others based on the employee's race, color, religion, sex, or national origin. *See Pacheco*, 448 F.3d at 787 (internal citations omitted). In such disparate treatment cases, proof and finding of discriminatory motive is required. *Id.* It is well established that Lavigne's burden of proof in disparate treatment cases is to identify similarly situated employees whose circumstances, including their misconduct, was "nearly identical" to Lavigne. *See Perez v. Tex. Dep't of Criminal Justice, Inst. Div.*, 395 F.3d 206, 213 (5th Cir. 2005) (citing *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991); *Smith v. Wal-Mart Stores*, 891 F.2d 1177, 1180 (5th Cir. 1990)).

First, the Court concludes that Lavigne failed to prove by a preponderance of the evidence that he was suspended for three days following the February 7, 2011 incident.

Indeed, according to Lavigne's testimony at trial, he was permitted on the Job Site the day after the incident. Thus, Lavigne failed to introduce evidence that he was prohibited from working for three days. Accordingly, Lavigne's claim shall be limited to his allegation that similarly situated non-African American employees were not placed on operator's probation following nearly identical situations.

Based on the evidence in the record, the Court concludes that Lavigne failed to identify similarly situated employees whose conduct was nearly identical to his. Indeed, the evidence shows that Smiley's November 10, 2010 incident was the result of mechanical failure, and not his violation of company policy or operator fault. Moreover, Lavigne's self-serving testimony that Smiley's incident was not the result of mechanical failure, but rather the result of operator fault, is insufficient. Lavigne failed to produce any tangible countervailing evidence of operator error. Further, the evidence shows that Smiley had a different immediate supervisor (i.e., Lehmann) than Lavigne (i.e., White) at the time of the incident.

Additionally, the record evidence fails to establish that Lavigne is similarly situated to Ficklin or Cagle. Indeed, it is undisputed that Ficklin's incident occurred on a different job (11-519 versus 10-596), that Ficklin worked for a different division of Cajun Deep (i.e., Pile Driving Division versus Drilling Division). Moreover, it is not clear that Ficklin was at fault for the incident (i.e., failure to prepare a pre-task plan) as Lavigne failed to produce such evidence. As it relates to Cagle, Lavigne did present evidence that Cagle caused damage to machinery while working job 10-600, but he failed to introduce sufficient evidence that he and Cagle had the same or similar

17

responsibilities at the time of the accident. Lavigne also failed to demonstrate that he and Cagle were under the supervision of the same Project Superintendent when their respective accidents occurred (i.e., Dennis Dozier versus Tom Lehmann). Moreover, Cagle and Lavigne did not have the same accident or violation history. Cagle's accident on January 5, 2011, was his only accident during the previous twenty-four months, while Lavigne's accident on February 7, 2011, was his second accident during the previous twenty-four months. Accordingly, Lavigne has failed to prove by a preponderance of the evidence that he is similarly situated to Smiley, Ficklin, or Cagle.

In sum, the Court finds that Lavigne has failed to prove by a preponderance of the evidence that Cajun Deep treated him worse than similarly situated non-African American employees. Accordingly, judgment in Lavigne's favor on this basis is unwarranted.

### D. DAMAGES

The Court notes that despite presenting evidence to support a request for emotional damages, Lavigne failed to include such request in his Complaint; nor did Lavigne amend his amend his Complaint to request such once he retained counsel. *See* Doc. 1, p. 3. Accordingly, Lavigne's request for emotional damages must be denied.

### V. Conclusion

In conclusion, the Court finds that Lavigne has proven by a preponderance of the evidence that he was paid less than a similarly situated non-African American employees for substantially the same job responsibilities during job numbers 11-500

and 11-527. Accordingly, the Court concludes that Lavigne has proven by a preponderance both his federal law disparate compensation claim based on job number 11-500, and his federal and state law compensation claims based on job number 11-527. As such, Lavigne is entitled to compensatory and punitive damages, including back pay, attorney's fees, and costs.

The Court further finds that Lavigne failed to prove by a preponderance of the evidence that Cajun Deep treated him worse than similarly situated non-African American employees following the February 7, 2011 incident. Accordingly, Lavigne's disparate treatment claim must be dismissed.

**IT IS ORDERED** that Lavigne's request for a judgment in his favor, injunctive relief, compensatory damages, and attorneys' fees and costs is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that all parties shall file memoranda regarding the issue of damages, attorney's fees, and costs, including evidence of prevailing wages and all other relevant considerations, in light of this ruling, on or before **March 4, 2015**. All motions shall comply with the Federal Rules of Civil Procedure and the Local Rules for the United States District Court for the Middle District of Louisiana.

Baton Rouge, Louisiana, this 4th day of February, 2015.

*[signature]*

**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**